IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:14cr127-MHT |
| | ) | (WO) |
| SUSIE MICHELLE STRENGTH | ) | |

OPINION

Defendant Susie Michelle Strength pled guilty
to tampering with a consumer product, pursuant to
18 U.S.C. § 1365(a)(4).  At her sentencing, the
court granted her motion for a downward 'variance,'
but rejected the parties' plea agreement, primarily
because the agreement failed to assure timely,
needed drug-treatment for Strength.  The court,
instead, fashioned what it believed to be a
sufficiently comparable sentence that will assure
such: a sentence of six months in custody followed
by two years in a residential drug-treatment
program.  This opinion explains why.

## I.   BACKGROUND

Strength, a former nurse suffering from a severe drug addiction to opiate painkillers, took morphine for personal use from the pharmacy at the hospital where she worked and then covered up the theft by replacing much of the morphine with saline solution.   This cover-up was the basis for her conviction of tampering with a consumer product.

Strength's addiction to pain medications stemmed from a series of physical and emotional traumas.   Strength was physically healthy until January 2008, when she was "t-boned" on the driver's side of her car, while driving with her five-year-old daughter.   Strength lost consciousness and was airlifted to the hospital.   She suffered pelvic and hip fractures, a lacerated scalp, and a concussion. After the accident, she experienced high levels of pain and was unable to work for about two months. She was prescribed Lortab, an opiate painkiller, for about six months for the pain.

Near the end of her second pregnancy in 2009, she again experienced significant hip pain, and she was again prescribed Lortab. She ended up having a C-section, after which she was prescribed morphine and Percocet for pain. After her son's birth, she was also diagnosed with depression and treated with anti-depressants, which she felt were ineffective.

In 2010, she again experienced severe hip pain, as well as a newly bulging disc in her back that made it difficult for her to function. Her doctor prescribed Lortab and a muscle relaxer. She was given epidurals and nerve blocks for pain, but they were ineffective. She was referred to a neurologist, who diagnosed her with nerve damage on her left leg and referred her to a pain specialist. The pain specialist prescribed Lortab, along with other medications. This treatment was successful. Strength reports that she was responsible with her medication during this period.

Unfortunately, in 2012, Strength was in another serious car accident, which resulted in a fatality. The accident occurred late at night in the rain.  A car was disabled on the side of the road and a 'good Samaritan' had stopped to help the driver and occupant of the car.  Strength accidentally hit the three people who were standing in the road at the time.  One of the people who had been in the disabled car died.  (Strength was not charged in the incident.)  Strength sustained contusions and was prescribed Percocet for pain.

Severe hip pain returned after the accident. Strength also became overwhelmed by grief about the death.  She cried constantly for the three months afterwards.  Then, a few months after the 2012 accident, one of the people from the accident sued her, causing additional stress.  She began going to a psychiatrist and therapy.  She felt exhausted, overwhelmed, and "shut down," and began having great difficulty at work.

**4**

Strength was diagnosed with PTSD due to the accident. She suffered nightmares and insomnia and was unable to drive in wet weather or on the road where the accident occurred. Her husband had to drive her to work. She still experiences anxiety when anything reminds her of the accident.

Strength also has been diagnosed with recurrent Major Depressive Disorder and generalized anxiety. As mentioned above, she was first diagnosed with depression after the birth of her son. Strength currently is prescribed two anti-depressants. She also takes Motrin and Tylenol for pain, and continues to experience chronic pain. She attends therapy and receives psychiatric care.

Strength's narcotic abuse developed after the accident in 2012. At first, she avoided taking her prescribed Lortab on days when she worked. By the fall of 2012, Strength had begun taking extra Lortab on her days off of work. She gradually increased to

taking Lortab every day. She also abused Xanax, which she had been prescribed for anxiety.

Her addiction grew progressively worse from there. In late 2012, she left her job in pediatric oncology after concern arose that she was coming to work while under the influence of narcotics.

In 2013, she obtained a new job at a hospital tending to adult patients. She heard that another nurse had taken morphine and replaced it with saline. Overwhelmed and in pain, she did the same. A suspicious pharmacist sent three bottles of morphine that had loose tops to a lab for analysis, and the analysis revealed that out of the 10 mg of fluid in the bottles, only 1.8 mg was morphine. The investigation also noted that some patients under her care complained of ineffective pain control and that records showed that she was giving patients two pain medications at the same time, which is an unusual practice.

Shortly after being confronted with the allegations, Strength turned herself in and voluntarily surrendered her nursing license, well before she was indicted.

## II. DISCUSSION

Strength's crime of conviction carries a custodial sentence of zero to ten years. 18 U.S.C. § 1365(a)(4).  As described below, the Sentencing Guidelines range for this offense is 41 to 51 months.  In a binding plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C), the government and Strength agreed to a sentence of 24 months incarceration, with a recommendation for immediate placement in the Bureau of Prison's Residential Drug Abuse Program (RDAP).  Probation recommended the same sentence.  To effect this agreement, Strength moved for a downward variance from the Guidelines range.

The government and Strength agreed that a sentence of 24 months with a recommendation for immediate placement in the RDAP would be reasonable and appropriate given the 18 U.S.C. § 3553(a) factors, particularly because of Strength's need for drug treatment for abuse of pain medication.

## A. Strength's Guidelines Calculations

Before adjustments or departures, Strength's base-offense level was 25. USSG § 2N1.1(a). However, she received a three-level downward adjustment for acceptance of responsibility. USSG § 3E1.1(b). Therefore, her final offense level was 22. Since Strength has no criminal history, she was in criminal history category I, resulting in a Guideline sentence range of 41-to-51 months. The offense-related adjustments for "serious bodily injury" or "death" were not applicable.

8

## B. Judicial Discretion in Sentencing

Having reviewed the Guidelines calculation, the court next determined a reasonable sentence. Under the Supreme Court's current <u>Booker</u> framework, the Sentencing Guidelines are not mandatory. <u>United States v. Booker</u>, 543 U.S. 220, 245 (2005). Instead, the district court must independently determine a reasonable sentence by applying the sentencing factors listed in 18 U.S.C. § 3553(a):

> "(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> "(2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other

        correctional treatment in the most
        effective manner;

    "(3) the kinds of sentences available;

    "(4) the kinds of sentence and the
    sentencing range established for-

        (A) the applicable category of
        offense committed by the applicable
        category of defendant as set forth
        in the [sentencing] guidelines ...

    "(5) any pertinent policy statement [by the
    Sentencing Commission] ...

    "(6) the need to avoid unwarranted sentence
    disparities among defendants with similar
    records who have been found guilty of
    similar conduct; and

    "(7) the need to provide restitution to any
    victims of the offense."

While calculations by the Guidelines are an

attempt to approximate these diverse factors, a

trial court may, in the course of an individual

sentencing, determine that "the case at hand falls

outside the 'heartland' to which the Commission

intends individual Guidelines to apply" or "the

Guidelines sentence itself fails properly to reflect

§ 3553(a) considerations ...." **Rita v. United States**, 551 U.S. 338, 351 (2007).

### C. Strength's Sentence

In this case, the court faced a dilemma, requiring it to balance competing values: to ensure that Strength, who the parties agreed has a serious opioid addiction that requires treatment, receives necessary treatment that prevents recidivism, while also imposing a sentence that appropriately reflects the nature and circumstances of the offense, the characteristics of the defendant, the seriousness of the offense, and the need for just punishment.

Having calculated the Guidelines range, having considered relevant policy statements, and having independently evaluated the resulting sentence in view of the § 3553(a) factors, the court rejected the Guidelines sentence. Instead, the court sentenced Strength to six months of incarceration followed by 24 months in a residential

drug-treatment program as a special condition of the defendant's three-year supervised release term.  The court chose this sentence for several reasons.

The court agreed with the government and Strength that a substantial downward 'variance' from the 41-to-51 month Guidelines sentence was warranted, for the nature and circumstances of this case take it far outside the heartland of cases the court has seen.  The court, of course, has seen many defendants whose crimes are related to--or in large part caused by--their drug abuse.  However, unlike the vast majority of drug abusers the court has seen, Strength did not become a drug addict through recreational, illicit drug use, but as a result of physician-prescribed treatment with very powerful opiate medication for serious chronic pain, which she suffered due to two horrific accidents.  In short, her <u>illegal</u> personal use of drugs grew out of an addiction based on her <u>legal</u> personal use.  In light of Strength's lack of fault in the

circumstances that led to her addiction, the parties
properly agreed that a substantial variance was
appropriate.[1]

_____

1.  Strength, who is 36 years old, has
commendably survived a very difficult life.  She had
a chaotic and difficult upbringing in a
dysfunctional family.  She also suffered significant
traumas and resulting physical and mental health
problems in her adult life.  She was born in Alabama
and lived there until she was five, when her parents
divorced.   Her father had been extremely violent
towards her mother.  Her mother moved her and her
sister to Florida, and her father remained in
Alabama and remarried.

When Strength was about seven years old, her
mother went to prison for about six months for
writing bad checks.  Strength was sent back to
Alabama to live with her father and stepmother.
Although her mother's sentence was only six months
long, Strength did not hear from her mother again
until she was a teenager.  She assumed her mother
was in prison the whole time, because no one said
otherwise.  She later learned the truth: that her
mother had chosen to have some contact with her
sister during that time, but not with her.  When she
finally saw her mother again, her mother spoke to
her sister, but not her.  She never received an
explanation for her mother's behavior.

When Strength was about 20 years old, her
mother visited her again, stole one of her checks,
and forged it. When Strength called to confront her
mother about it, her mother's new husband told her
(footnote continued)

not to ever call again.

Her relationship with her father was also dysfunctional.  He was emotionally and verbally abusive to her as a child, telling her she was "worthless" and that she would grow up to be a "whore like her mother."  When angry, her father would break things and would pick her up by the shoulders and throw her against the door.  He was violent towards her sister as well.

Strength first married in 2002 when she was around 24 years old, after becoming pregnant. According to Strength, her husband was addicted to crack, cocaine, and speed, and spent all of their money while she was giving birth, leaving them homeless.  He was violent, burned her clothes in front of the house, pointed guns at her, threatened to kill himself and her, vandalized her car, and threw lit cigarettes at her and their child. She fled during an argument when the child was three months old, and her husband burned everything she owned.  Strength's daughter has not seen her biological father since she was two years old, and he reportedly owes $90,000 in back child support.

Through all of this adversity, Strength strove to succeed.  She graduated from high school with a 3.14 GPA in 1996.  At age 19, Strength took a job as a day-care teacher, and she eventually worked her way up to assistant director of the facility.  After leaving her first husband, when her daughter was one year old, Strength enrolled in college to pursue a nursing degree.  She attended community college as a single parent from 2003 to 2007 and graduated with an Associate's Degree in Nursing and a 3.2 GPA.  In 2007, she went to work as a pediatric oncology (footnote continued)

14

The court also agreed with the government and Strength that Strength's conduct warranted some incarceration or something comparable.  See 18 U.S.C. § 3553(a)(2)(A)&(B).  While Strength pled to one count of removing morphine from a bottle and

_____

nurse.

Strength remarried in 2008. She and her husband have custody of their 4-year-old son and her 12-year-old daughter, and on weekends they care for his 11-year-old child from a prior relationship. Strength has been a responsible parent with regard to her daughter's education.  Her daughter was diagnosed with attention deficit disorder in second grade and dyslexia in fourth grade.  She consistently performed poorly in school, but the school system denied her special education services. Strength and her husband sought an outside evaluation for her and were successful in obtaining special education services for her.  Her daughter now attends a school with a dyslexia program, and her academic performance is good.

While this history reflects that Strength is on her way to becoming an exemplary parent and citizen and while it serves as additional background to the sentence the court imposed, the hardships and the successes in this history are not sufficient to separate Strength from most other defendants who appear before the court, and thus her history was not the basis for the court's rejection of the plea agreement.

replacing it with saline, the presentence report found that morphine was missing from three bottles, and she admitted that her actions caused patients to unnecessarily suffer pain. Strength administered additional pain medication to her patients, apparently to compensate for the effects of the diluted morphine; however, this act shows her conscious awareness of the risk that her actions would cause her patients pain. This was a very serious offense. Moreover, given that she was introducing a foreign substance into injectable medication, it could have been much worse.

The court also agreed with the government and Strength that Strength is in need of immediate and substantial drug treatment, both to help heal Strength and help protect the public from Strength's potential recidivism. See 18 U.S.C. § 3553(a)(2)(D) (courts shall consider the need to provide the defendant with needed medical care in the most effective manner) & § 3553(a)(2)(C) (courts shall

16

consider the need for a sentence "to protect the public from further crimes of the defendant").

In effort to reflect all these concerns, the government and Strength agreed to a sentence of 24 months in the Bureau of Prisons, with a recommendation of immediate placement in RDAP, a 500-hour intensive substance-abuse treatment program. However, the rub for the court was that the proposed 24-month sentence was too short to guarantee sufficiently that Strength would receive treatment in custody. The Bureau of Prisons has significant waiting lists to get into the RDAP program, and, depending on whom one asks, the Bureau requires a minimum of a 24-month or 33-month sentence to get into the program. The Bureau moves each prisoner from prison (where the treatment program is available) to a halfway house approximately six months before release; this reduces the term during which the treatment can be provided. In addition, on its website, the Bureau

17

states that one factor in whether a prisoner is admitted to RDAP is whether the prisoner's sentence is long enough to complete the program. In light of all these factors, the court was deeply concerned that Strength would more than likely end up receiving no treatment during incarceration at all, and then being released back into the free world without adequate preparation to stay drug-free.

Seeking to address this concern, the court invited the parties and the Probation Department to submit alternative proposals that would guarantee that the defendant would receive treatment but would provide an approximately equivalent punishment. While the government and defense, bound by their plea agreement, did not submit an alternative sentencing proposal, probation identified and proposed a 24-month placement at a residential drug-treatment program for women.[2]

---

2. The court also notes that Strength has been (footnote continued)

The court adopted this program as part of the sentence but added a six-month term of incarceration. In light of the seriousness of the offense the defendant committed, particularly the act of covering up her theft of medication by replacing morphine with saline in one or more bottles that would be later used by patients, the court felt it imperative that she receive a significant sentence of incarceration in addition to the punishment of being removed from her family for 24 months, as just punishment and as a deterrent from reoffending. See 18 U.S.C. § 3553(a)(2)(A)&(B).

In choosing the sentence it did, the court also sought to impose a punishment that was approximately

the stay-at-home mother to two young children and weekend stepmother to one. The treatment facility in which she will remain for two years allows visits by children. While this factor was not a basis for the court's sentence, it will ensure her ability to remain in close contact with them, for their sake, as they grow.

equivalent to the reduced one agreed to by the government and Strength. As stated, the government and Strength agreed that a sentence of 24 months was the appropriate period of time for Strength to be removed from her community and family as punishment for this offense. While the court's sentence substituted the 24-month residential drug treatment for 18 months of the prison sentence, it compensated by actually removing Strength from her community and family for a total of 30 months--six months of imprisonment and 24 months of residential drug treatment--followed by an additional year of supervised release. Thus, the court's sentence will actually pull Strength away from her family for a longer period of time than provided in the plea agreement. For Strength, who has no criminal history or experience serving time in jail or prison, this will be a difficult and life-changing experience.

20

Therefore, under the imposed sentence, the court attempted to maintain, or arguably even enhance, Strength's punishment and subsequent deterrence by separating her from her community for a significant period of time, while, at the same time, attempting, with the assured residential drug treatment, to take more aggressive steps to help protect the public from her potential recidivism.

\* \* \*

For all these reasons, the court found that the sentence imposed was sufficient but not greater than necessary to comply with the purposes of § 3553(a).

DONE, this the 17th day of December, 2014.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE